**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Joseph Anthony Favors,

Plaintiff,

v.

Michelle Sexe, Marshal Smith, Nancy Johnston, Collet Grimm, and Carly Goettlicher,

Defendants.

Case No. 26-cv-3731 (ECT/DJF)

**ORDER AND**
**REPORT AND RECOMMENDATION**

---

This matter is before the Court on review of Plaintiff Joseph Anthony Favors's Complaint for Declaratory, Injunctive, and Compensatory Damages and Relief ("Complaint") (ECF No. 1) pursuant to 28 U.S.C. § 1915. The Court also considers Mr. Favors's *Motions for IFP in this Case* ("IFP Applications") (ECF Nos. 2, 7) and *Motion for Appointment of Counsel* (ECF No. 5).

Mr. Favors is civilly committed to the Minnesota Sex Offender Program ("MSOP") administered by Direct Care and Treatment ("DCT"), a state agency. (*See, e.g.*, ECF No. 1 ¶¶ 1, 6–7; Minn. Stat. § 246C.02, subd. 1; Minn. Stat. § 246C.13.) The crux of Mr. Favors's Complaint is that MSOP staff unlawfully revoked his placement in Community Preparation Services ("CPS"), an MSOP program offering a less restrictive residential setting outside a secure treatment facility to which committed persons can be transferred. (*See, e.g.*, ECF No. 1 ¶¶ 8, 39; Minn. Stat. § 246B.01, subd. 2a.) For the following reasons, the Court recommends dismissing portions of this action and allowing the remainder to proceed. The Court therefore grants Mr. Favors's second IFP Application, denies the first IFP Application as moot, and takes steps to initiate service. The Court also denies Mr. Favors's Motion for Appointment of Counsel without prejudice.

## BACKGROUND

### I. Parties

Mr. Favors brings this action under 42 U.S.C. § 1983 and 42 U.S.C. § 1985 against five MSOP/DCT officials. (*See* ECF No. 1 ¶¶ 8–12, 15.) Based on the allegations in the Complaint, Defendant Michelle Sexe has been the Director of CPS in Saint Peter, Minnesota since May 2025, and was an assistant director of CPS in 2019. (*See id.* ¶¶ 8, 44.) Defendants Marshall Smith and Nancy Johnston both work for the Minnesota Department of Human Services, "serving as Executive Director of the DCT/MSOP Board." (*Id.* ¶ 9.)[1] Defendant Collet Grimm has been an Assistant Director of CPS since about November 2023. (*Id.* ¶ 11.) Lastly, Defendant Carly Goettlicher was the "Lead Security Counselor" of CPS's Sunrise East Living Unit, where Mr. Favors lived at times relevant to the Complaint. (*Id.* ¶¶ 12, 24.)

### II. Substantive Allegations

Mr. Favors pleads the following facts, which the Court accepts as true for present purposes. On November 14, 2019, the Commitment Appeal Panel—the judicial appeal panel established under Minn. Stat. § 253B.19, subd. 1("Judicial Appeal Panel")—ordered Mr. Favors transferred to CPS. (*See* ECF No. 1 ¶¶ 7, 43.) Mr. Favors alleges that in 2024 and 2025, Defendant Goettlicher, CPS Unit Director Michael Lanin, and CPS Security Counselor Brent Huibregtse harassed him, issued him false rule violation reports, and conducted unwarranted "compliance check[s]" of his

[1] Mr. Favors spells Mr. Smith's first name "Marshal" in the Complaint's caption and in several paragraphs. (*See* ECF No. 1 at 1, ¶¶ 9, 28.) The correct spelling is "Marshall," which DCT's website uses (as noted below) and Mr. Favors uses elsewhere in the Complaint. (*See, e.g.*, *id.* ¶¶ 10, 13–14.) According to DCT's public website, Mr. Smith has been DCT's Health System CEO since 2016, and Ms. Johnston has been MSOP's Executive Director since 2012. *See Marshall E. Smith*, Minn. Direct Care & Treatment, https://mn.gov/dct/about-direct-care-treatment/our-leadership/our-executive-team/marshall-smith (last visited Oct. 25, 2026); *Nancy Johnston*, Minn. Direct Care & Treatment, https://mn.gov/dct/about-direct-care-treatment/our-leadership/our-executive-team/nancy-johnton (last visited Oct. 25, 2026).

room. (*See id.* ¶¶ 11–12, 22–23, 36.) In June 2025, he submitted two grievances to Defendant Sexe, in which he complained about the alleged mistreatment, asked her to direct the staff members to let him "disassociate" from them, and asked that he "have nothing to do with" Ms. Goettlicher, Mr. Lanin, or Mr. Huibregtse. (*Id.* ¶¶ 8, 22–23.)

On June 16, 2025, the day after Mr. Favors filed his second grievance, Ms. Goettlicher summoned him to a meeting with Ms. Sexe, which Ms. Grimm also attended. (*See id.* ¶¶ 23–25.) Ms. Sexe allegedly said, "If you do not sign yourself into the secured facility for sixty days, I will revoke your transfer to CPS, and you will not come back in sixty days." (*Id.* ¶ 26.) Mr. Favors refused, said he had done nothing wrong, and walked to his room. (*See id.* ¶ 29.) Ms. Goettlicher then radioed that Mr. Favors was "out of control" and called for the "A-Team" to remove him "in full restraints" to the secure facility. (*Id.* ¶ 30.) That same day, Ms. Sexe wrote a "Report of Revocation of Transfer to Community Preparation Services," stating that Mr. Favors had "regressed in his treatment participation and … application of treatment skills," had been "unwilling to meet with treatment staff," and was "refusing to engage in conversations about his treatment." (*Id.* ¶ 31.) The report concluded that Mr. Favors needed "a more structured environment to address his treatment needs." (*Id.*) On July 20, 2025, Ms. Sexe had him transferred from the "secured facility in St. Peter" to the "super-max DCT facility in Moose Lake, Minnesota," where he remains. (*Id.* ¶¶ 6, 40.)

Mr. Favors claims that: (1.) CPS detainees without "[l]apsing [b]ehaviors" are not sent to Moose Lake (*id.* ¶¶ 40–41, 61(ii)); (2.) Ms. Sexe told him in December 2019, while holding copies of grievances Mr. Favors had filed against other CPS detainees and shaking them, "This stays inside the secured facility. We don't write grievance out here at CPS!" (*id.* ¶ 44–45); and (3.) Ms. Johnston was present in September 2021 when other detainees with whom Mr. Favors had conflicts

were moved into his living unit (*see id.* ¶¶ 47(a)–(b)). Mr. Favors alleges Mr. Smith and Ms. Johnston "supervised, authorized, and enforced" his CPS revocation and were aware of Ms. Sexe's report. (*Id.* ¶ 10.) Though Mr. Favors says he has appealed the revocation, he claims the appeal process "takes over two years to complete." (*Id.* ¶¶ 28, 48.)

## III. Claims and Relief Sought

Liberally construed, the Complaint seeks to bring the following claims under 42 U.S.C. § 1983:

- Claim One: that Ms. Sexe, Ms. Grimm, and Ms. Goettlicher retaliated against him in violation of the First Amendment by revoking his CPS transfer, requesting his removal from CPS in restraints, and transferring him to Moose Lake in response to his June 2025 grievances. (*See id.* ¶¶ 50–64.) Mr. Favors also suggests that Ms. Sexe retaliated against him for asserting his rights to free speech and association and his right to refuse treatment. (*See* ECF No. 1 ¶¶ 37–38, 54.)

- Claim Two: that Ms. Sexe independently violated Mr. Favors's First Amendment rights to freedom of speech and association by revoking his transfer for the reasons stated in her report, namely, that Mr. Favors would not meet or converse with treatment staff and would not interact with his "treatment community". (*See id.* ¶¶ 31, 65–69.)

- Claim Three: that Ms. Sexe, Ms. Grimm, Mr. Smith, and Ms. Johnston violated Mr. Favors's Fourteenth Amendment right to procedural due process by: (1.) revoking his transfer, and thus depriving him of certain CPS-associated privileges, without an advance hearing before the Commitment Appeal Panel; and (2.) by subjecting him to an appeal process that takes more than two years. (*See id.* ¶¶ 70–78.)

- Claim Four: that the same four Defendants also violated his right to procedural due process by retroactively applying Minn. Stat. § 253D.29, subd. 3(a)(2)—which Mr. Favors calls a "new law" enacted in 2013—to override his right to refuse treatment under the Minnesota Health Care Bill of Rights, Minn. Stat. § 144.651, subd. 12. (*See* ECF No. 1 ¶¶ 79–80, 84–86.)

Along with these expressly enumerated claims, the Complaint appears to assert a variety of additional, unenumerated claims, including:

- That Mr. Smith and Ms. Johnston are liable under 42 U.S.C. § 1986 for failing to prevent the deprivation of his rights by MSOP staff. (*See id.* ¶¶ 10, 17(f).)

- That Ms. Johnston and others deliberately created a hostile environment by moving certain detainees with whom he had a history of conflicts into his living unit in 2021. (*Id.* ¶¶ 47(a)–(c).)

- That Defendants are liable under various state-law theories, including a claim of "common law Therapeutic Malpractice" against Ms. Sexe and Ms. Grimm; violation of the grievance and treatment-refusal provisions of Minn. Stat. § 144.651, subds. 12 and 20; and violation of a DCT anti-nepotism policy. (*See id.* ¶¶ 27, 37, 55, 96(8).)

Mr. Favors seeks various forms of relief. He seeks a declaration against all Defendants, in their official capacities, that Defendants' acts and omissions "violated [his] rights." (*Id.* ¶ 98.) He asks for injunctive relief, against all Defendants in their official capacities, "void[ing]" his revocation report and the associated process. (*Id.* ¶ 99.) And he seeks compensatory damages against all Defendants in their individual capacities. (*See id.* ¶¶ 96, 100.)

## ANALYSIS

### I. Standard of Review

Rather than pay this action's filing fee, Mr. Favors filed the IFP Applications, which indicate that he would financially qualify for *in forma pauperis* ("IFP") status. But the federal statute governing IFP proceedings provides that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss [a case proceeding IFP] at any time if the court determines that … the action … fails to state a claim on which relief may be granted …." 28 U.S.C. § 1915(e)(2)(B).

When deciding whether a complaint states a claim, a court accepts its factual allegations as true and grants the plaintiff every reasonable inference. *See, e.g.*, *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 836 (8th Cir. 2014) (citing *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 854 (8th Cir. 2014)). A complaint need not be detailed, but its allegations must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). It must also "state a claim to relief that is plausible on its face." *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility test is "context-specific" and depends on a court's "judicial experience and common sense." *Id.* at 679; *see also Zink v. Lombardi*, 783 F.3d 1089, 1098 (8th Cir. 2015) (per curiam). Although courts read pro se complaints liberally, such pleadings still must include enough facts to support each claim. *See, e.g.*, *Sandknop v. Mo. Dep't of Corr.*, 932 F.3d 739, 741–42 (8th Cir. 2019).

## II. Claims Surviving Review Under 28 U.S.C. § 1915(e)(2)(B)

Only two of Mr. Favors's claims survive the Court's review under 28 U.S.C. § 1915(e)(2)(B). Mr. Favors's First Amendment retaliation claim (Claim One) should be allowed to proceed against Ms. Sexe (in her individual capacity for damages and her official capacity for prospective injunctive relief) and Ms. Goettlicher (in her individual capacity for damages) to the extent that it is based on their alleged responses to his June 2025 grievances. (*See* ECF No. 1 ¶¶ 22–23, 50–64.) A portion of Mr. Favors's due process claim (Claim Three) should also be allowed to proceed: The Court recommends allowing Mr. Favors's procedural due process challenge to move forward based on the alleged two-year period required to complete the CPS transfer revocation appeal process. These claims should proceed only against Mr. Smith and Ms. Johnston (in their individual capacities for damages and their official capacities for prospective injunctive relief), to whom he attributes that review process. (*See id.* ¶¶ 28, 48, 70, 77.)

This determination does not preclude Defendants, who have not yet appeared, from bringing any available motion under Rule 12 of the Federal Rules of Civil Procedure or raising any other available defense against these surviving claims. The Court recommends dismissing the remainder of Claim Three and the Complaint's remaining claims for the reasons given below.

## III. Sovereign Immunity

Sovereign immunity bars any claims against Defendants in their official capacities for monetary damages or retrospective declaratory relief. Although the Complaint expressly seeks damages only against Defendants in their individual capacities (*see id.* ¶¶ 13–14, 100), the Court—construing the Complaint liberally—also addresses any official-capacity damages claims the Complaint might reasonably be interpreted to assert. The Complaint alleges that every Defendant works for the Minnesota Department of Human Services or DCT (a state agency). (*See* ECF No. 1 ¶¶ 1, 8–12, 93.) A lawsuit against a state official in his or her official capacity amounts to a lawsuit against the State itself, and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983" when sued for damages. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989); *see also, e.g.*, *Calzone v. Hawley*, 866 F.3d 866, 872 (8th Cir. 2017). Furthermore, the Eleventh Amendment bars damages claims against unconsenting states and their officials when sued in their official capacities, and it is well established that Section 1983 does not abrogate that immunity. *See, e.g.*, *Will*, 491 U.S. at 66; *Roe v. Nebraska*, 861 F.3d 785, 789 (8th Cir. 2017). Therefore, any official capacity claim Plaintiff might seek to assert for monetary damages fails on sovereign immunity grounds.

Related principles limit Mr. Favors's requested declaratory relief. Under *Ex parte Young*, 209 U.S. 123, 155–56, 159 (1908), a plaintiff can seek prospective relief against a state official to stop an ongoing violation of federal law, but the Eleventh Amendment bars a federal court from declaring that state officials violated federal law when there is no ongoing violation at issue. *See, e.g.*, *Green v. Mansour*, 474 U.S. 64, 73 (1985); *Filyaw v. Corsi*, 150 F.4th 936, 944, 946 (8th Cir. 2025), *cert. denied*, 223 L. Ed. 2d 556 (2026). Thus, to the extent Mr. Favors merely seeks a

declaration that Defendants' past acts and omissions violated his rights (*see* ECF No. 1 ¶ 98), that request is retrospective and cannot proceed.

By contrast, the Complaint's request for an injunction reversing his transfer's revocation is prospective, not retrospective. (*See id.* ¶ 99.) Insofar as this request rests on the claims surviving 28 U.S.C. § 1915(e)(2)(B) review, it may remain in the case—with one caveat. *Ex parte Young* requires that an official sued must have "some connection with the enforcement" of the challenged action. 209 U.S. at 157. The Complaint does not allege that Ms. Goettlicher, a lead security counselor, has any authority to revoke or reinstate a CPS transfer. (*See* ECF No. 1 ¶¶ 12, 26, 31.) Any official-capacity claim against her thus falls outside *Ex parte Young* and fails on the ground that she has no alleged connection with the enforcement of decisions related to his transfer.

Because sovereign immunity places these claims outside the Court's jurisdiction, the Court recommends dismissing them without prejudice even though repleading them could not plausibly cure that defect. *See, e.g.*, *Hart v. United States*, 630 F.3d 1085, 1088, 1091 (8th Cir. 2011).

## IV. Refusal of Treatment

Claim Two posits that Ms. Sexe violated Mr. Favors's First Amendment rights to free speech and free association by revoking his transfer because he would not meet with treatment staff, ended contact with certain staff members, refused to discuss treatment, and disengaged from his treatment community. (*See* ECF No. 1 ¶¶ 65–69.) Mr. Favors also suggests that the same conduct counts as additional "protected conduct" underlying his First Amendment retaliation cause of action in Claim One. (*See id.* ¶¶ 54–55, 61(iii)–(v).) Neither theory states a claim.

The Court starts with freedom of association. The First Amendment protects freedom of association "in two distinct senses": (1) "intimate human relationships" (protected as "a fundamental element of personal liberty"); and (2) association "for the purpose of engaging in

those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984). The Constitution does not "recognize[] a generalized right of social association." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) (citation modified); *see, e.g., DeWalt v. City of Brooklyn Park*, No. 15-cv-4355 (PAM/KMM), 2017 WL 2178310, at *7 (D. Minn. May 17, 2017), *aff'd*, 715 F. App'x 580 (8th Cir. 2018). Mr. Favors's decisions to not to meet or speak with clinical staff, and to withdraw from his overall therapeutic environment, do not involve either an intimate relationship or an association for expressive purposes. (*See* ECF No. 1 ¶¶ 31, 36–38, 68.) He instead refused to participate in the institutional program to which he is civilly committed. The First Amendment's right to freedom of association does not plausibly reach this conduct.

Nor does free speech turn Mr. Favors's decision not to participate in treatment into a form of protected expression. There is a right to refrain from speaking that bars the government from compelling people to speak or help spread its message. *See, e.g.*, *Wooley v. Maynard*, 430 U.S. 705, 714–15 (1977); *Sanderson v. Hanaway*, 163 F.4th 1101, 1106 (8th Cir. 2026), *cert. denied*, No. 26-34, 2026 WL 3116611 (U.S. Oct. 19, 2026). But this right does not plausibly prevent a state treatment program from considering a committed person's failure to participate in treatment when deciding what environment best meets his treatment needs. The Complaint does not allege that anyone forced Mr. Favors to state a given message. And strictly speaking, he remains free to refuse treatment, which the Complaint itself confirms he has done, at least as to treatment involving certain staff members. (*See* ECF No. 1 ¶¶ 36, 61(v).)

The real target of Mr. Favors's free-speech challenge is DCT's clinical judgment—specifically, that his refusal to engage in his treatment made CPS an inappropriate forum to meet his needs. (*See id.* ¶ 31.) Minnesota law expressly directs MSOP to weigh "the person's clinical

progress and present treatment needs" and consider "which facility can best meet the person's needs" in determining whether transfer out of a secure facility is appropriate, and authorizes revocation when "the committed person has regressed in clinical progress so that the facility to which the committed person was transferred is no longer sufficient to meet the committed person's needs." Minn. Stat. §§ 253D.29, subd. 1(b)(1), (4), subd. 3(a)(2). Treatment professionals' decisions about care for and the needs of civilly-committed individuals are entitled to deference. *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 321–23 (1982); *Karsjens v. Harpstead*, 74 F.4th 561, 569 (8th Cir. 2023). Given that deference, the Court cannot conclude that considering Mr. Favors's withdrawal from aspects of his treatment in determining which facility best met his needs violated his right to free speech.

Mr. Favors's claimed right to refuse treatment expressly arises from a state statute. *See* Minn. Stat. § 144.651, subd. 12. (*See, e.g.*, ECF No. 1 ¶¶ 37, 86.) But it is well established that "a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. § 1983." *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993); *see, e.g.*, *Rasmusson v. Chisago Cnty.*, 991 F. Supp. 2d 1065, 1077 (D. Minn. 2014). The state statute on which Mr. Favors relies does not establish the First Amendment violations he has asserted in Claims One and Two.

However, the Court makes two final clarifying points regarding Mr. Favors's legal theories underlying this claim. First, to the extent Mr. Favors's request not to interact with particular staff members was part of his June 2025 grievances, the request remains relevant to the surviving, grievance-based retaliation claim. (*See* ECF No. 1 ¶¶ 22–23, 61(iv).) The Court's recommendation here pertains only to the theory that refusing to participate in treatment or communicate with DCT staff more broadly is independently protected First Amendment activity.

Second, Mr. Favors's Claim Two duplicates the second part of Claim One: it rests on the same revocation, focuses on the same report, and seeks the same relief. (*See id.* ¶¶ 54, 56, 66, 96–100.)

Because the problems with Mr. Favors's theories here are legal, not factual, and no additional allegations could turn his refusal to participate in treatment into protected expression or association, the Court recommends dismissing with prejudice Claim Two and the portion of Claim One arising from the theory that MSOP revoked his transfer in response to him refusing treatment and declining to communicate with staff.

## V. First Amendment Retaliation as to Defendant Collet Grimm

Claim One should be further narrowed. To state a First Amendment retaliation claim, "a plaintiff must plausibly plead that he/she 'engaged in protected activity and that defendants, to retaliate for the protected activity, took adverse action against them that would chill a person of ordinary firmness from engaging in that activity.'" *Zutz v. Nelson*, 601 F.3d 842, 848–49 (8th Cir. 2010) (citation modified) (quoting *Lewis v. Jacks,* 486 F.3d 1025, 1028 (8th Cir. 2007)); *see also, e.g.*, *Perry v. City of Waterville*, No. 25-cv-3352 (LMP/LIB), 2026 WL 1802969, at *9 (D. Minn. June 23, 2026) (quoting *Zutz*), *reconsideration denied*, 2026 WL 2445365 (D. Minn. Aug. 20, 2026). Because Section 1983 does not support vicarious liability, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see, e.g.*, *Wilansky v. Morton Cnty.*, 179 F.4th 633, 639 (8th Cir. 2026).

Mr. Favors alleges Ms. Grimm was "aware" of his grievances, did not discipline the relevant staff members, and attended the meeting on June 16, 2025. (*See* ECF No. 1 ¶¶ 11–12, 25.) But Mr. Favors does not allege Ms. Grimm did anything at that meeting, approved or recommended his revocation, or played any role in his transfer to Moose Lake. The Complaint's

bare assertion, "[b]ased on information and belief," that Ms. Grimm shared an "unstated plan" with Ms. Sexe and Ms. Goettlicher to place Mr. Favors in the secure facility (*id.* ¶ 35) is a conclusion without factual support, and therefore, the Court does not accept it. *See, e.g.*, *Iqbal*, 556 U.S. at 678–81. Similarly, Mr. Favors's allegation that Ms. Sexe and Ms. Grimm had the authority to order his transfer to Moose Lake (*see* ECF No. 1 ¶ 61(ii)) does not plausibly allege that Ms. Grimm in fact exercised that authority. Claim One should thus be dismissed without prejudice insofar as it targets Ms. Grimm.

## VI. Procedural Due Process Claims

Claims Three and Four assert procedural due process challenges arising under the Fourteenth Amendment. "The Supreme Court mandates a two-step analysis for procedural due-process claims: 'We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient.'" *Jenner v. Nikolas*, 828 F.3d 713, 716 (8th Cir. 2016) (quoting *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)); *see also, e.g.*, *Raymond v. Bd. of Regents of Univ. of Minn.*, 140 F. Supp. 3d 807, 815 (D. Minn. 2015). Generally speaking, due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The process due in a given context depends on the private interest affected, the risk of erroneous deprivation due to procedures used (and the probable value of added safeguards), and the government's interest. *See, e.g.*, *Zinermon v. Burch*, 494 U.S. 113, 127 (1990); *Doe v. Univ. of Ark.–Fayetteville*, 974 F.3d 858, 866 (8th Cir. 2020).

### A. Revocation Without a Prior Hearing

As previously discussed, the Court recommends that Claim Three survive only as to the alleged two-year delay in reviewing Mr. Favors's revocation, and only as against Mr. Smith and

Ms. Johnston. In all other respects, the Court recommends dismissing Claim Three for failure to state a claim. For present purposes, the Court assumes, without deciding, that a committed person transferred to CPS by order of the Judicial Appeal Panel has a protected liberty interest in staying there. *Cf. McDeid v. Johnston*, 984 N.W.2d 864, 868, 872 n.3, 877, 879 (Minn. 2023) (holding MSOP detainees' right to transfer to CPS within reasonable time after final Judicial Appeal Panel transfer order was "clearly established" for qualified immunity purposes, and assuming without deciding that failure to transfer within that time violated procedural due process). Even given that assumption, however, the Court concludes that the lack of a pre-revocation hearing did not deny Mr. Favors due process.

Under Minnesota law, MSOP's executive director can revoke a committed person's transfer from a secure treatment facility if "remaining in a nonsecure setting will not provide a reasonable degree of safety to committed person or others," or if "the committed person has regressed in clinical progress so that the facility to which the committed person was transferred is no longer sufficient to meet the committed person's needs." Minn. Stat. § 253D.29, subd. 3(a). When revocation occurs, MSOP returns the committed person to a secure facility immediately. *See id.* § 253D.29, subd. 3(b). Within seven days of the committed person's return, the executive director must issue a report "outlin[ing] the specific reasons for the revocation including, but not limited to, the specific facts upon which the revocation is based." *Id.* §§ 253D.29, subd. 3(b)–(c). The report must be provided to the committed person and his counsel, and he must be informed "orally and in writing" of his rights. *Id.* § 253D.29, subd. 3(c). He can then petition the Special Review Board for review within seven days of receiving the report. *Id.* § 253D.29, subd. 3(e). If he does, the matter "shall be scheduled within 30 days," and the Board must provide a recommendation to the Judicial Appeal Panel concerning the revocation. *Id.* The Judicial Appeal Panel's decision is

subject to appellate review in the Minnesota Court of Appeals. *Id.* § 253D.28, subd. 4; Minn. Stat. § 253B.19.

This framework plainly provides for notice of the specific grounds for a revocation and for a hearing before a neutral reviewing body shortly after the revocation. The Due Process Clause does not always require a hearing *before* the State acts: "[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (collecting cases); *see, e.g.*, *reVamped LLC v. City of Pipestone*, 163 F.4th 462, 467–68 (8th Cir. 2025). Consider parole revocation, for instance: though revoking a defendant's parole concerns the loss of conditional liberty outside any institution, it is well established that due process is satisfied by a prompt preliminary inquiry after arrest and a final hearing within a reasonable time. *See, e.g.*, *Morrissey v. Brewer*, 408 U.S. 471, 485–88 (1972). The Court is aware of no reasonable rationale why post-deprivation process would suffice in that context and not in this case, in which the deprivation at issue is a reduction of liberty within an institutional setting. Moreover, the State's interest in responding quickly to clinical or safety concerns is substantial. *See, e.g.*, *Youngberg v. Romeo*, 457 U.S. 307, 320–24 (1982).

The Complaint does not allege MSOP denied Mr. Favors the executive director's revocation report or prevented him from petitioning the Special Review Board. To the contrary, he quotes the report "in its entirety" and acknowledges he "filed [an] Appeal." (ECF No. 1 ¶¶ 31, 48.) The lack of procedure *before* his return to the secure facility thus did not violate due process, and that portion of Claim Three should be dismissed. Whether the review that followed has been sufficiently timely is a different question, which, as previously stated, the Court does not decide at this stage in the proceedings.

### B. Claims against Defendants Sexe and Grimm

Notably, the part of Claim Three that should proceed does not plausibly involve Ms. Sexe or Ms. Grimm. As previously stated, Section 1983 liability requires each defendant to personally participate in the alleged constitutional violation, *see, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), and the Complaint does not plausibly allege that Ms. Grimm participated in any way in the decision to revoke Mr. Favors's transfer. And while Ms. Sexe allegedly authored the revocation report (*see* ECF No. 1 ¶ 31), there is no suggestion she was involved in his post-revocation review. The issue in Claim Three that survives review concerns the timing of Mr. Favors's post-revocation review, and the Complaint attributes that review process to Mr. Smith and Ms. Johnston. (*See id.* ¶¶ 28, 48.) Because Mr. Favors does not allege either Ms. Sexe or Ms. Grimm has any role in scheduling or conducting the Special Review Board's review or the Judicial Appeal Panel's decision,[2] the Court recommends dismissing Claim Three without prejudice to the extent Mr. Favors brings it against Ms. Sexe or Ms. Grimm.

### C. Retroactive Application of Minn. Stat. § 253D.29

The crux of Claim Four is that Defendants applied a "new law" retroactively—specifically, the revocation standard in Minn. Stat. § 253D.29, subd. 3(a)(2)—to bypass Mr. Favors's preexisting statutory right to refuse treatment in Minn. Stat. § 144.651, subd. 12. (*See* ECF No. 1 ¶¶ 84–86.) But the revocation standard that Mr. Favors challenges predates both his 2019 transfer to CPS and his 2025 revocation. Subdivision 3(a)(2) was added to the relevant statute in 2011, and the statute was later recodified to section 253D in 2013. *See* 2011 Minn. Laws ch. 102, art. 1,

---

[2] The Complaint's reference to a "presumption" by Ms. Sexe, Mr. Smith and Ms. Johnston "that they can subject [Mr. Favors] to the deficient agency process" (ECF No. 1 ¶ 78) is a bare conclusion that fails to identify any act on the part of Ms. Sexe bearing on the timing of Mr. Favors's review. *See, e.g.*, *Iqbal*, 556 U.S. at 678.

§ 2; 2013 Minn. Laws ch. 49, §§ 7, 22. On its face, applying a statute to conduct or events occurring after its passage is not a retroactive application.

Even setting this point aside, how Minnesota handles statutory retroactivity is a state law matter, and an asserted conflict between two state statutes does not establish a federal due process claim. *See*, *e.g.*, *Bagley v. Rogerson*, 5 F.3d 325, 328 (8th Cir. 1993) ("[A] violation of state law, without more, does not state a claim under the United States Constitution or 42 U.S.C. § 1983."). No amendment could cure these legal defects. The Court therefore recommends dismissing Claim Four with prejudice.

**VII. Failure to Prevent Constitutional Violations**

Mr. Favors also suggests he intends to sue Mr. Smith and Ms. Johnston under 42 U.S.C. § 1986 for failing to prevent MSOP staff from violating his constitutional rights. (*See* ECF No. 1 ¶ 10.) However, Section 1986 is inapposite. Liability under 42 U.S.C. § 1986 for deprivation of rights requires proof of a conspiracy that is actionable under 42 U.S.C. § 1985(3). *See, e.g.*, *Barstad v. Murray Cnty.*, 420 F.3d 880, 887 (8th Cir. 2005); *Sebastian v. United States*, 531 F.2d 900, 904 n.11 (8th Cir. 1976). Alleging a Section 1985(3) conspiracy requires pleading "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). Therefore, to establish liability under Section 1986, a plaintiff must plead race- or class-based discriminatory intent.

The Complaint here alleges no class-based animus, nor any specific facts suggesting an agreement among Defendants.[3] The Complaint thus does not plead a viable section 1985 claim, and therefore, any section 1986 claim also fails.

---

[3] The Complaint's reference to an "unstated plan" among Ms. Sexe, Ms. Grimm, and Ms. Goettlicher, alleged on information and belief, is too conclusory to state a conspiracy claim, *see Iqbal*, 556 U.S. at 678, and does not involve Mr. Smith or Ms. Johnston. (*See* ECF No. 1 ¶ 35.)

Mr. Favors's allegations against Mr. Smith and Ms. Johnston (ECF No. 1 ¶¶ 10, 17(f)), might also be construed as asserting supervisory liability claims against Mr. Smith and Ms. Johnston under Section 1983. A supervisor is liable only for his or her own misconduct, and cannot be held liable under Section 1983 on a theory of respondeat superior. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Hunt v. Acosta*, 109 F.4th 1003, 1009 (8th Cir. 2024).

Mr. Favors fails to assert a viable supervisory liability claim because the allegations that Mr. Smith and Ms. Johnston "personally supervised, authorized, and enforced" Mr. Favors's revocation and were "aware" of Ms. Sexe's report (ECF No. 1 ¶ 10) are conclusory recitals; they provide no specific facts describing what Mr. Smith or Ms. Johnston personally did or failed to do to violate Mr. Favors's rights. Mr. Favors's allegation that Mr. Smith and Ms. Johnston "knew, or should have known," that Ms. Sexe (allegedly) acted with retaliatory intent (*id.* ¶ 88) is similarly conclusory.

The Complaint's single specific allegation of retaliatory conduct against Ms. Johnston is that she was present at CPS in September 2021 when other detainees were moved into Mr. Favors's unit and responded to a question about the moves by saying "I don't know. I'll find out." (*Id.* ¶ 47(b).) But this does not plausibly allege that Ms. Johnston directed those detainees' moves, much less that she intended to harm Mr. Favors, nor does it explain how the transfer of other detainees into Mr. Favors's unit might have violated his constitutional rights. Mr. Favors's assertion that, "[b]ased on information and belief," Ms. Johnston acted to create a hostile environment (*id.* ¶ 47(c)) is mere speculation. Moreover, this single specific allegation does nothing to connect Ms. Johnston to Mr. Favors's 2025 revocation. Furthermore, the Complaint includes no specific allegation of retaliatory conduct at all as to Mr. Smith. For these reasons, the Court recommends

dismissing the Section 1986 claims and any potential Section 1983 supervisory liability claims against Mr. Smith and Ms. Johnston without prejudice.

## VIII. State Law Theories

The Complaint also refers to a DCT nepotism policy, to Minn. Stat. § 144.651, and to "common law Therapeutic Malpractice." (*Id.* ¶¶ 27, 37, 55, 96(8).) To the extent Mr. Favors intends these references to advance independent state law claims, the Court lacks original jurisdiction over them.[4] The Court can exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) only over a claim that forms part of the same case or controversy as the surviving retaliation claim, and any such claim must itself be adequately pleaded to proceed.

None of these state law theories are adequately pleaded. Mr. Favors does not identify any provision of the alleged nepotism policy or allege any facts (beyond describing Ms. Goettlicher as Ms. Sexe's "friend" and "co-worker (ECF No. 1 ¶ 27)) establishing that any Defendants are related or otherwise covered by such a policy. Nor does the Complaint identify any authority creating a private right of action to enforce such a policy. As for Minn. Stat. § 144.651, the Minnesota Court of Appeals has already told Mr. Favors specifically that Section 144.651 does not create a private cause of action. *See Favors v. Kneisel*, 902 N.W.2d 92, 96 (Minn. Ct. App. 2017). And finally, Mr. Favors's "Therapeutic Malpractice" allegation rests on a single clause asserting that Ms. Sexe and Ms. Grimm mismanaged "transference and counter-transference of their therapist handling Plaintiff." (ECF No. 1 ¶ 96(8).) This clause identifies no treating professional, no standard of care, no specific departure from the standard, and no resulting injury. So, it fails to state any state-

---

[4] The civil cover sheet reflects that all parties are citizens of Minnesota, so diversity jurisdiction under 28 U.S.C. § 1332 is unavailable.

law negligence claim. The Court recommends dismissing these state-law theories without prejudice for these reasons.

## IX. Conclusion

For the reasons foregoing reasons, the Court recommends that this action be allowed to proceed on two claims: (1.) Mr. Favors's First Amendment retaliation claim (Claim One) against Ms. Sexe and Ms. Goettlicher; and (2.) the portion of Claim Three against Mr. Smith and Ms. Johnston concerning the delay in reviewing Mr. Favors's transfer revocation. The Court therefore grants Mr. Favors's second IFP application (ECF No. 7), denies his first application (ECF No. 2) as moot, and orders steps to initiate service on these four Defendants.

This leaves Mr. Favors's Motion for Appointment of Counsel, which the Court denies. There is no constitutional or statutory right to appointed counsel in a civil case. *See, e.g.*, *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006); *Ward v. Smith*, 721 F.3d 940, 942 (8th Cir. 2013). Under 28 U.S.C. § 1915(e)(1), a court "may request an attorney to represent any person unable to afford counsel," but this provision is discretionary, not mandatory. *See, e.g.*, *Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 301–10 (1989). Relevant factors include: "(1) the factual complexity of the issues; (2) the ability of the indigent person to investigate the facts; (3) the existence of conflicting testimony; (4) the ability [of the] indigent person to present the claims; and (5) the complexity of the legal arguments." *Crozier v. Westside Cmty. Sch. Dist.*, 973 F.3d 882, 889 (8th Cir. 2020).

Those factors do not warrant appointing Mr. Favors counsel at this time. The Complaint's claims arise from events that Mr. Favors personally experienced at MSOP facilities, so the main facts material to his claims are within his own knowledge. Furthermore, Mr. Favors's submissions thus far demonstrate that he can investigate the relevant facts and articulate his claims. Nor does

the prospect of conflicting testimony call for counsel now: No Defendant has been served or appeared, discovery has not yet begun, and whether this case will produce any credibility contests remains to be seen. The Court therefore denies the Counsel Motion without prejudice.

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1. Plaintiff Joseph Anthony Favors's second application to proceed *in forma pauperis* (ECF No. 7) is **GRANTED** and his first application (ECF No. 2) is **DENIED AS MOOT**.

2. The Clerk of Court is directed to send to the email account designated by the Minnesota Attorney General's Office: (1) a Notice of Electronic Filing notifying the State of Minnesota that this lawsuit has been filed and that *in forma pauperis* status has been granted; and (2) a copy of the operative pleading in this matter (ECF No. 1).

3. The Minnesota Attorney General's Office is directed to file a "Waiver of Service Executed" form by **November 16, 2026** with respect to the following defendants: Michelle Sexe, Carly Goettlicher, Marshall Smith, and Nancy Johnston; except that if any such Defendant does not waive service, the Minnesota Attorney General's Office shall file a statement identifying those Defendants for whom service of process is not being waived.

4. Plaintiff's Motion for Appointment of Counsel (ECF No. 5) is **DENIED WITHOUT PREJUDICE**.

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. All official-capacity claims for monetary damages, all official-capacity claims against Defendant Carly Goettlicher, and Plaintiff's request for a declaration that Defendants' past acts and omissions violated his rights, be **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

2. To the extent not dismissed under Paragraph 1, the following claims be **DISMISSED WITH PREJUDICE** under 28 U.S.C. § 1915(e)(2)(B)(ii):

a. The portion of Claim One asserting independently protected First Amendment activity based on Plaintiff's refusal to participate in treatment or communicate with MSOP staff.

b. Claim Two.

c. Claim Four.

3. To the extent not dismissed under Paragraphs 1 and 2, the following claims be **DISMISSED WITHOUT PREJUDICE** under 28 U.S.C. § 1915(e)(2)(B)(ii):

a. Claim One, as to Defendant Collet Grimm.

b. The portion of Claim Three asserting a right to a pre-deprivation hearing, and all causes of action under Claim Three against Defendants Sexe and Grimm.

c. All claims against Defendants Marshall Smith and Nancy Johnston other than Claims Three and Four, including any claim under 42 U.S.C. § 1986.

d. Plaintiff's state-law claims, including his claims under Minn. Stat. § 144.651, under the DCT nepotism policy, and for common law therapeutic malpractice.

4. Defendant Collet Grimm be **DISMISSED** from this action.

Dated: November 16, 2026

*s/ Dulce J. Foster*
DULCE J. FOSTER
United States Magistrate Judge

**NOTICE**

**Filing Objections:** The Report and Recommendation component of this Order and Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. *See* Local Rule 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).